IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MATTHEW WEAVING

                    Plaintiff,

    v.

CITY OF HILLSBORO,

                    Defendant.

No. 10-CV-1432-HZ

OPINION AND ORDER

Jaime B. Goldberg
ATTORNEY AT LAW
P.O. Box 86463
Portland, OR 97286

       Attorney for Plaintiff

Karen M. O'Kasey
HART WAGNER, LLP
1000 SW Broadway, 20th Floor
Portland, OR 97205

       Attorney for Defendant

1 - OPINION AND ORDER

HERNANDEZ, District Judge:

Plaintiff Matthew Weaving ("Plaintiff" or "Weaving") filed this action against defendant City of Hillsboro ("Defendant" or the "City") on November 22, 2011.  Plaintiff alleges the City discriminated against him based on his alleged Attention Deficit Hyperactivity Disorder ("ADHD") disability.  The Complaint seeks nine claims for relief pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and Oregon law, ORS 659A.112.  Compl., p. 1; Id., ¶¶ 31-43.  Now before me is the motion for summary judgement (doc. #21) filed by Defendant and the motion for partial summary judgment (doc. #24) filed by Plaintiff.  For the reasons that follow, Defendant's motion for summary judgment is DENIED, and Plaintiff's motion for partial summary judgment is DENIED.

## BACKGROUND

As a child, Plaintiff was diagnosed with ADHD.  Weaving Decl., ¶¶ 3, 5 (doc. #31).  In 1995, Plaintiff began working as a police officer for the Beaverton, Oregon Police Department ("Beaverton Police Department").  Compl., ¶ 8.  Plaintiff worked as a police officer at the Beaverton Police Department for over ten years, and in 2006 applied for a position as a patrol officer at Defendant's Police Department (hereinafter, the "Police Department").  Id., ¶¶ 10-11.

As part of the hiring process with the Police Department, Plaintiff participated in a psychological evaluation with Dr. Howard Deitch ("Dr. Deitch").  O'Kasey Decl., Ex. 3, 526:13-527:1 (doc. #23).  During the psychological evaluation, Plaintiff told Dr. Deitch he had been diagnosed with ADHD in the first grade and had been prescribed Dexedrine for his ADHD until the seventh grade.  Id., Ex. 2, 34:2-9 (doc. #23).  Plaintiff, however, told Dr. Deitch he had "essentially outgrown [the] ADHD symptoms" and did not request any accommodation for his

2 - OPINION AND ORDER

ADHD when applying for the position with the Police Department.  Id., 32:7-25, 34:24-35:13, 38:10-17 (doc. #23); Weaving Decl., ¶ 8 (doc. #28); Compl. ¶¶ 10, 29.

Plaintiff was ultimately hired by the Police Department as a patrol officer in March 2006. O'Kasey Decl., Ex. 2, 38:10-17 (doc. #23); Weaving Decl., ¶ 8 (doc. #28).  That same year, 2006, Plaintiff met with the then-Commander of the Police Department, Allen Zaugg ("Commander Zaugg"), about "some issues" arising between him and his direct supervisor, Sergeant John Marshall ("Sergeant Marshall").  O'Kasey Decl., Ex. 2, 37:5-9, 13-16 (doc. #23).  During his meeting with Commander Zaugg, Plaintiff failed to mention that he had been diagnosed with ADHD.  Id., 37:23-38:1 (doc. #23).

In April 2007, Plaintiff was promoted to Police Sergeant.  Compl. ¶¶ 10, 29; O'Kasey Decl., Ex. 2, 38:10-17 (doc. #23); Weaving Decl., ¶ 8 (doc. #28).  After his promotion, Plaintiff received a performance evaluation in which it was noted that Plaintiff needed assistance in "how he communicate[d] with his officers."  O'Kasey Decl., Ex. 2, 38:10-17 (doc. #23), 39:21-40:1; Weaving Decl., ¶ 8 (doc. #28).  Plaintiff did not state during his performance evaluation that he had been diagnosed with ADHD or "attribute[] [his] communication problem" to ADHD. O'Kasey Decl., Ex. 2, 41:24-42:4 (doc. #23).

None of the command staff at the Police Department, including Chief of Police Lila Ashenbrenner ("Chief Ashenbrenner"), Deputy Chief of Police Chris Skinner ("Deputy Chief Skinner"), or Commander Zaugg, ever told Plaintiff they perceived him as having a disability. Id., 66:3-8, 9-18,67:1-5, 75:16-20, 94:6-95:8 (doc. #23).  No physician, psychologist, or nurse practitioner, including psychologist Gary Monkarsh, Ph.D. ("Dr. Monkarsh"), ever documented Plaintiff was not qualified to work in law enforcement because of his ADHD.

3 - OPINION AND ORDER

Deputy Chief Skinner testified he was aware of "flaws in [Plaintiff's] communication style and relationships . . . [and] certainly knew some of that was in play" at the time Plaintiff was hired in 2008.  Goldberg Decl. Ex. 1, p. 4 (doc. #26).  On July 25, 2008, and on August 6, 2008, Plaintiff met with Judy Clarke, a psychologist hired by the Police Department, who provided counseling "on improving [Plaintiff's] communication skills."  Weaving Decl., ¶ 10 (doc. #31).  Judy Clarke herself testified that she had "coaching sessions" with Plaintiff "to really help focus on some of [Plaintiff's] communication–building his communication with his subordinates."  Goldberg Decl. Ex. 4, p.1 (doc. #26).

On April 1, 2009, a hostile work environment complaint was filed against Plaintiff. O'Kasey Decl., Ex. 2, 44:2-16, 44:24-25-45:1 (doc. #23).  Plaintiff was subsequently placed on administrative leave and an internal affairs investigation was initiated.[1]  Weaving Decl., Ex. 2, p.1 (doc. #31).  In a memorandum dated April 7, 2009, Deputy Chief Skinner stated Plaintiff had been "described by numerous individuals . . . as tyrannical, unapproachable, non-communicative, belittling and demeaning, threatening/intimidating, arrogant and vindictive."  Id. (doc. #31).  In a letter dated April 13, 2009, Lieutenant Richard Goerling ("Lieutenant Goerling") requested "the City of Beaverton provide to the City of Hillsboro all records relating to [Plaintiff's] job performance, including personnel files, supervisory files, disciplinary files, internal affairs files, documentation related to complaints made by [Plaintiff] against others, original application for employment, background investigation and any report of psychological evaluation . . . ." Goldberg Decl., Ex. 8, pp. 28-29 (doc. #32).

---

[1] Prior to being placed on administrative leave, Plaintiff had never been disciplined by the Police Department.  Weaving Decl., ¶ 31 (doc. #31).

4 - OPINION AND ORDER

In April 2009, subsequent to being placed on administrative leave, Plaintiff saw nurse practitioner Maureen Conway ("Nurse Conway") who prescribed Vivance for Plaintiff's ADHD. O'Kasey Decl., Ex. 2, 52:13-16, 54:11-23 (doc. #23). After his visit with Nurse Conway, Plaintiff had his first visit with Dr. Monkarsh on April 23, 2009, who diagnosed Plaintiff with ADHD. Id., Ex. 2, 52:7-9 (doc. #23); Weaving Decl., Ex. 4, pp.1- 2 (doc. #31).

In a letter dated May 4, 2009, Plaintiff was informed that there were "allegations and concerns regarding [Plaintiff's] interactions with subordinates, peers and supervisors." Weaving Decl., Ex. 3, pp. 1-2 (doc. #31). That same month, May 8, 2009, Plaintiff told Defendant that he had been diagnosed with ADHD and thus needed an accommodation for his alleged disability. O'Kasey Decl., Ex. 4, p.1 (doc. #23). Specifically, Plaintiff met with Defendant's Human Resources Director, Amy Heinlen ("Director Heinlen"), and provided her with a letter from Dr. Monkarsh dated May 7, 2009, explaining Plaintiff had been diagnosed with ADHD and that "with on-going counseling, . . . w[ould] eliminate any possibility of engaging in impulsive communication with all supervisors, co-workers, and citizens he comes in contact with at the Hillsboro Police Department." Weaving Decl., Ex. 4, pp.1- 2 (doc. #31). Plaintiff also provided Defendant with a letter dated May 8, 2009, wherein Dr. Monkarsh requested that "all reasonable accommodations be made by the City of Hillsboro to accommodate [Plaintiff's] disorder," "including" returning him to active duty "as a Patrol Sergeant . . . without any undue delay." Id., p. 3 (doc. #31).

Deputy Chief Skinner, who was overseeing the internal affairs investigation, was informed about Dr. Monkarsh's May 7, 2009, letter, but determined it "was not particularly salient to what [the City] was doing" because of the ongoing "disciplinary investigation."

5 - OPINION AND ORDER

O'Kasey Decl., Ex. 6, 11:6-11, 11:21-12:12 (doc. #23).  On May 27, 2009, Plaintiff's internal

affairs interview took place, lasting over four and one-half hours.  Id., Ex. 2, 60:3-7 (doc. #23);

Weaving Decl. ¶ 18 (doc. #31).  During the internal affairs interview, Plaintiff was interviewed

by Lieutenant Goerling and Lieutenant Douglas Ehrich ("Lieutenant Ehrich").  O'Kasey Decl.,

Ex. 2, 61:15-19 (doc. #23).  During the interview, neither Lieutenants Goerling nor Ehrich

inquired about Plaintiff's ADHD or requested to speak with Dr. Monkarsh.  Weaving Decl. ¶ 18

(doc. #31).  On the other hand, Plaintiff did not tell Lieutenants Goerling or Ehrich about Dr.

Monkarsh's May 7, 2009, letter, about his accommodation request, or that he had been diagnosed

with ADHD.  O'Kasey Decl., Ex. 2, 60:10-14,61:15-19 (doc. #23).

     On June 10, 2009, Plaintiff received three letters from Director Heinlen and Commander

Zaugg dated the same day, June 10, 2009.  Weaving Decl., Ex. 7-10 (doc. 31).  The letters

notified Plaintiff he was required to attend several fitness for duty examinations.  Id. (doc. #31).

The letters also stated, "We appreciate your cooperation in moving through this [Independent

Medical Evaluation ("IME")] process so we can affirm your fitness for duty and release to full

duty as quickly as possible."  Id., Ex. 7-8, 10 (doc. #31).

     Plaintiff participated in two fitness for duty evaluations on June 16, 2009, and June 18,

2009, with Dr. Kirk Johnson, Ph.D. ("Dr. Johnson"), and one fitness for duty evaluation on June

25, 2009, with Dr. S. David Glass, M.D. ("Dr. Glass").  Weaving Decl., ¶¶ 23-24 (doc. #28).  Dr.

Johnson supported Dr. Monkarsh's diagnosis of ADHD.  Goldberg Decl., Ex. 5, pp. 2, 6, 11 (doc.

#26).  Similarly, in a letter dated August 8, 2009, Dr. Glass concluded Plaintiff's medical record

supported a diagnosis of ADHD.  Id., Ex. 6, pp. 5-6 (doc. #26).  Dr. Glass further opined that

Plaintiff's diagnosis of ADHD, "particularly when treated with medication, would not be a reason

for him to be declared unfit for duty or unsafe."  Id. (doc. #26).  On August 9, 2009, Dr. Glass

sent a letter to the City's attorney, C. Akin Blitz, stating that "[a] requirement for continued

counseling [for Plaintiff] seem[ed] appropriate."  Id., Ex. 12, p. 2 (doc. #26).

After the internal affairs investigation concluded, Deputy Chief Skinner notified Plaintiff

in a letter dated November 24, 2009, that the City intended to terminate Plaintiff.   O'Kasey

Decl., Ex. 7, pp. 1-1 (doc. #23).  On December 1, 2009, a pre-termination hearing with Deputy

Chief Skinner was held, and on December 11, 2009, Defendant terminated Plaintiff.  Weaving

Decl. ¶¶ 26- 27 (doc. #31).  Plaintiff appealed the December 11, 2009, decision and pursuant to

the City's policy, another hearing was held on March 30, 2010.  O'Kasey Decl., Ex. 9, 4:1-12

(doc. #23).  The March 30, 2010, hearing was held before the Honorable Frank Bearden, a

Multnomah County senior circuit court judge, who acted as Hearings Officer at Plaintiff's

administrative proceeding.  Id. (doc. #23).  Judge Bearden stated on record that the hearing

involved "finding of facts and a recommendation to the City Manager . . . [who had the discretion

to] accept, reject, or modify [his] recommendation."  Id., 4:1-9 (doc. #23).  On April 5, 2010,

Judge Bearden recommended Plaintiff's discharge be affirmed and Plaintiff's appeal be denied,

but explicitly noted he was "not . . . making the decision."  Id., 4:7-9 (doc. #23); Id., Ex. 10, p. 5

(doc. #23).

## STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  The moving party

bears the initial burden of demonstrating the absence of a genuine issue of material fact.  E.g.,

7 - OPINION AND ORDER

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it could affect the

outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  The moving party need only demonstrate that there is an absence of evidence to

support the non-moving party's case.  Id. at 325.  The burden then shifts to the nonmoving party

to establish, beyond the pleadings, that there is a genuine issue for trial.  Celotex Corp., 477 U.S.

at 324.

Once the moving party has met its burden, the burden shifts to the non-moving party to

"set out 'specific facts showing a genuine issue for trial.'"  Id. (quotation omitted).  To carry this

burden, the non-moving party must "do more than simply show that there is some metaphysical

doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be

believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v.

Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson, 477 U.S. at 255).  The non-moving

party, however, must come forward with more than "the mere existence of a scintilla of

evidence."  Anderson, 477 U.S. at 252.  Thus, "[w]here the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 587 (citation omitted).  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment ."  Id.

However, conclusory, speculative testimony in affidavits and moving papers is insufficient to

raise genuine issues of fact and defeat summary judgment.  See Thornhill Publ'n Co., Inc. v. GTE

Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

## I. Evidentiary Objections

Both parties raised numerous evidentiary objections throughout their briefs.  The

objections by both parties are OVERRULED as moot to the extent that I do not rely on the

disputed evidence.   The portions of the record objected to by the parties and on which I rely are

OVERRULED on the basis that they do not violate any Federal Rule of Evidence ("FRE") as

argued by the parties.

## II. The ADA and Oregon Law

In order to prevail on a disability discrimination claim under the ADA, Plaintiff must first

establish a prima facie case of discrimination.  See, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44

(2003); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  To make out a prima facie

case of disability discrimination under the ADA, Plaintiff must show that he (1) has or is

perceived as having a disability; (2) is a qualified individual, and (3) was unlawfully

discriminated against because of his disability.  E.g., Nunes v. Walmart Stores, Inc., 164 F.3d

1243, 1246 (9th Cir. 1999).  The Ninth Circuit analyzes ADA cases using the burden-shifting

analysis from McDonnell Douglas.  E.g., Raytheon Co., 540 U.S. at 49-50.  The burden shifting

analysis set forth in McDonnell Douglas applies to both federal and state claims.  E.g., Risteen v.

Wal-Mart Stores, Inc., Civ. No. 09-6020-AA, 2010 WL 1838105, at *3 (D. Or. 2010).  As stated

by the United States Supreme Court in McDonnell Douglas, once Plaintiff establishes a prima

facie case of discrimination, the burden shifts to Defendant to provide a non-discriminatory

reason for the adverse employment action. E.g., Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d

1201, 1207 (9th Cir. 2008). If Defendant does so, the burden shifts back to Plaintiff to show

Defendant's reason was a pretext for discrimination. Id.

The ADA prohibits discrimination against qualified individuals with a disability and

individuals perceived as having a disability. 42 U.S.C. § 12112(a). The ADA provides that no

employer falling within the scope of the ADA may "discriminate against a qualified individual

with a disability because of the disability of such individual in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation, job

training, and other terms, conditions, and privileges of employment." 42 U.S.C. §§ 12112(a); see

also 42 U.S.C. § 12111(5) (defining employer). A "qualified individual with a disability" is

identified as "an individual with a disability who, with or without reasonable accommodation,

can perform the essential functions of the employment position that such individual holds or

desires." 42 U.S.C. § 12111(8).

"[P]laintiff must first demonstrate that [he] is disabled within the meaning of the [A]ct."

E.g., Paulus v. Kaiser Permanente Med. Grp., Inc., No. C–98–0025–VRW, 1999 WL 342041, at

*1 (N.D. Cal. 1999). The ADA defines an individual with a disability as someone who: (1) has a

physical or mental impairment that substantially limits one or more of the individual's major life

activities; (2) has a record of the impairment; or (3) is regarded as having an impairment. 42

U.S.C. § 12102(2)(A). The term "substantially limits" means "[u]nable to perform a major life

activity that the average person in the general population can perform; or . . . [s]ignificantly

restricted as to the condition, manner or duration under which an individual can perform a

particular major life activity as compared to the condition, manner, or duration under which the

average person in the general population can perform that same major life activity."  29 C.F.R. §

1630.2(j)(1)(i)-(ii).

Oregon's Discrimination Against Disabled Persons in Employment Act (the "Oregon

ADA") is modeled after the ADA and contains language that is similar to the ADA.  <u>Wheeler v.</u>

<u>Marathon Printing, Inc.</u>, 157 Or. App. 290, 301 n.6 (1998).  The Oregon ADA provides that

"[ORS] 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is

consistent with any similar provisions of the [ADA]."  ORS 659A.139.  Oregon's law tracks the

ADA and defines "disability" in an identical manner.  ORS 659A.100.  Under Oregon law, it is

an "unlawful employment practice for any employer to refuse to hire, employ or promote, to bar

or discharge from employment or to discriminate in compensation or in terms, conditions or

privileges of employment on the basis of disability."  ORS 659A.112 (1).  For the purposes of

ORS 659A.112, an "individual is qualified for a position if the individual, with or without

accommodation, can perform the essential functions of the position."

## III.  Defendant's Motion for Summary Judgment

### A. Whether Plaintiff Is Disabled

#### 1. Substantially Limited in Interacting With Others and Communicating

Plaintiff alleges that because of his ADHD he is substantially limited in the major life

activities of communicating with other people, interacting with other people, and working with

other people.  Compl., ¶ 7; Weaving Decl., ¶¶ 3, 5 (doc. #31).  Defendant asserts ADHD is not

considered a disability under the ADA and therefore summary judgment must be granted in its

favor.  <u>Wright v. COMPUSA, Inc.</u>, 352 F.3d 472,476-77 (1st Cir. 2003); <u>Calefv. Gillette Co.</u>,

322 F.3d 75, 83 (1st Cir. 2003); <u>Doebele v. Sprint/United Management Co.</u>, 342 F.3d 1117,1129-

31 (10th Cir. 2003); Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499 (7th Cir. 1998).  I disagree with Defendant.

"Under the ADA . . . 'disability' is a carefully defined term of art, which is measured by reference to limitations on major life activities, not by reference to doctors' past assessments of the plaintiff's condition."  Amyette v. Providence Health Sys., 388 Fed. Appx. 606, 607 (9th Cir. 2010) (superseded by statute on other grounds).  "It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment" under the ADA.  Id. (citation omitted).  The Ninth Circuit has previously recognized that "communicating with others" and "interacting with others" are major life activities as defined under the ADA.[2]  E.g., Head v. Glacier Nw., Inc., 413 F.3d 1053, 1060 (9th Cir. 2005) ("Interacting with others" is a major life activity); McAlindin v. Cnty. of San Diego, 192 F.3d 1226, 1233-34 (9th Cir. 1999) (same); Fraser v. Goodale, 342 F.3d 1032, 1044 (9th Cir. 2003) (communicating with others is a major life activity); see also ORS 659A.104(2)(a-z) ("Activities and functions that are considered major life activities . . . include but are not limited to: . . . communicating, working, socializing, and interacting with others.").  "Whether the conduct affected is a major life activity for purposes of the [ADA] is . . . a legal question for the court." Doebele, 342 F.3d at 1129 (internal citations omitted).

---

[2] Effective May 24, 2011, the term "major life activities include, but are not limited to: . . . [c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working . . . ."  29 C.F.R. § 1630.2(i) (emphasis added).  The prior version of 29 C.F.R. § 1630.2(i) did not specifically state that "communicating" and "interacting with others" were major life activities.  Defendant, however, did not comment about this difference in its briefs or at oral argument on January 23, 2012.

12 - OPINION AND ORDER

None of the cases cited by Defendant stands for the proposition that ADHD is not considered a disability under the ADA.  To the contrary, several of the cases on which Defendant relies suggests ADHD may be considered a disability under the ADA if there is sufficient supporting evidence.  See Wright, 352 F.3d at 476-77 (First Circuit stating an "employee with attention deficit hyperactivity disorder not disabled under ADA absent [a] showing that [he is] substantially limited in the major life activities of learning or speaking"); Davidson v. Midelfort Clinic, Ltd., 133 F.3d at 506 (Seventh Circuit stating, "There is no dispute that [Attention Deficit Hyperactivity Disorder] qualifies as an impairment for purposes of the [ADA].").

Alternatively, Defendant argues Plaintiff's claim fails as a matter of law, regardless of whether he has ADHD, because he proffers no evidence showing his ADHD substantially limited him in any major life activity.  Defendant relies heavily on McAlindin, 192 F.3d at 1235, where the Ninth Circuit stated that not every "cantankerous person will be deemed substantially limited in a major life activity" and that "[m]ere trouble getting along with coworkers is not sufficient to show a substantial limitation."  Defendant argues Plaintiff failed to claim any difficulty with learning, speaking, or working before being placed on administrative leave and in fact was successful enough to be promoted to Police Sergeant in April 2007.  At oral argument on January 23, 2012, Defendant emphasized that Plaintiff's claims fail because he presents no evidence demonstrating he is substantially limited in the major life activity of speaking, specifically asserting that the record is devoid of any evidence indicating Plaintiff is incapable of speaking at all.

Defendant's arguments are unavailing.  Plaintiff's complaint and briefs repeatedly allege Plaintiff is disabled in the major life activity of communicating–not speaking.  This

13 - OPINION AND ORDER

distinction is significant because the ADA distinguishes between "speaking" and "communicating," both of which are considered major life activities. 42 U.S.C. § 12102(2)(A). Defendant's argument that it is entitled to summary judgment because Plaintiff is not substantially limited in the major life activity of speaking misses the mark and is not grounds on which to grant its motion.

In addition, the Ninth Circuit's decision in McAlindin tends to favor Plaintiff's position. In McAlindin, 192 F.3d at 1235, the Ninth Circuit held that with respect to the major life activity of interacting with others, "plaintiff must show that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.'" Id. Here, Deputy Chief Skinner stated that there were "potential allegations of hostility and offensive behaviors in the workplace which call[ed] into question [Plaintiff's] suitability and fitness to serve as a supervisor in the Hillsboro Police Department." Weaving Decl., Ex. 2, p.1 (doc. #31) (emphasis added). He also stated Plaintiff "created an offensive and hostile work environment for peers and subordinates that . . . ha[d] been significant over a long period of time and affected at least two assignment failures at Beaverton Police Department." O'Kasey Decl., Ex. 7, p. 2 (doc. #23) (emphasis added). Similarly, Lieutenant Goerling stated that "[Plaintiff's] hostile and offensive email, and his near stalking behavior . . . demonstrate[d] a disturbing lack of interpersonal skills . . . ." Goldberg Decl., Ex. 15, pp. 1, 3 (doc. #32) (emphasis added).

Furthermore, Plaintiff offers evidence indicating his problems extend beyond just getting along with coworkers. For example, Plaintiff proffers evidence showing

Lieutenant Goerling observed that his behavior "demonstrate[d] complete failure of basic interpersonal relationship skills such as emotional and social intelligence that are embodied . . . generally in society." Goldberg Decl., Ex. 15, p. 13 (doc. #32) (emphasis added). The allegations of hostility and lack of interpersonal skills described by Deputy Chief Skinner and Lieutenant Goerling raise a genuine issue of material fact as to whether Plaintiff is substantially limited in the major life activity of interacting with others.

Finally, Defendant argues that the information provided by Dr. Monkarsh only establishes Plaintiff has problems with "impulsive communication" and does not establish a substantial limitation in any major life activity, citing Hoang v. Wells, Fargo Bank, N.A., 724 F. Supp. 2d 1094, 1103 (D. Or. 2010), Doebele, 342 F.3d at 1131, Badri v. Huron Hosp., 691 F. Supp. 2d 744, 758 (N.D. Ohio 2010), and Steele v. Thiokol Corp., 241 F.3d 1248, 1254-55 (10th Cir. 2001) in support of its proposition. None of the cases on which Defendant relies, however, supports the proposition that Plaintiff is not disabled. In fact, the cases which Defendant cites tend to support Plaintiff's position, not Defendant's position.

For example, in Hoang, the United States District Court for the District of Oregon stated:

> [A] plaintiff is substantially limited in interacting with others when the mental . . . impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people–at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.

15 - OPINION AND ORDER

Id. at 1103 (citing Jacques v. DiMarzio, Inc., 386 F.3d 192, 204 (2nd Cir. 2004)).

As noted above, Lieutenant Goerling stated Plaintiff "demonstrate[d] a disturbing lack of interpersonal skills."  Goldberg Decl., Ex. 15, pp. 1, 3 (doc. #32).  In addition, Commander Zaugg stated in an email dated June 15, 2009, that "[t]he additional and more significant reason for [the need of Plaintiff's IMEs was] that . . . [Plaintiff's] actions and interactions with others at [the Police Department] ha[d] been called into question by many and [were] the subject of serious concern."  Weaving Decl., Ex. 12, p. 2 (doc. #31).  The evidence before me meets the test set forth in Hoang, 724 F. Supp. 2d at 1103 and is sufficient to create a genuine issue of material fact as to whether Plaintiff is substantially limited in the major life activity of interacting with others.

In Doebele, 342 F.3d at 1131, the Tenth Circuit held plaintiff failed to "create a fact issue concerning whether her impairments substantially affected her ability to interact with others." The Tenth Circuit concluded that "while there is no question [plaintiff] had difficulty interacting with a number of her coworkers, there [was] no evidence tending to show she had problems interacting with people in general" where the undisputed evidence demonstrated "she played softball and volleyball on organized teams, was in a group at work that collected Beanie Babies, babysat, went to Kansas State and Kansas City Chiefs football games, was active in her local college alumni association, and had a boyfriend on and off for a number of years with whom she went to church, the movies and out to dinner."  Id.  The evidence here does not rise to the level of interaction presented in Doebele.  Accordingly, Doebele is distinguishable on its facts.

In Badri, 691 F. Supp. 2d at 758, the United States District Court for the Northern District of Ohio concluded that the fact "[p]laintiff had little or no social life, and was beginning to

16 - OPINION AND ORDER

withdraw" did not "rise to the level of a qualifying disability."  The evidence here, however, goes well beyond that in <u>Badri</u>.  As noted earlier, Lieutenant Goerling expressly stated that Plaintiff's behavior demonstrated a "complete failure of basic interpersonal relationship skills" possessed "generally in society."  Goldberg Decl., Ex. 15, p. 13 (doc. #32).  Plainly stated, <u>Badri</u> is unpersuasive.

I am equally unpersuaded by Defendant's reliance on <u>Steele</u>, 241 F.3d at 1254-55.  In <u>Steele</u>, 241 F.3d at 1255, the Tenth Circuit concluded that although plaintiff's dysthymia "made it hard for him to be in crowded places," it did not satisfy the requirement set forth in <u>McAlindin</u>,192 F.3d at 1235 that plaintiff demonstrate "his relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary."  (Internal quotation marks omitted).  As discussed above, Plaintiff presents sufficient evidence creating a triable issue of fact that Plaintiff meets the test set forth in <u>McAlindin</u>.

In addition to interacting with others, Plaintiff also presents sufficient evidence creating a triable issue of fact as to whether he has problems communicating with others.  For example, Deputy Chief Skinner expressly concluded Plaintiff had "interpersonal communication deficiencies."  O'Kasey Decl., Ex. 8, p. 1 (doc. #23).  Similarly, Dr. Monkarsh opined Plaintiff's "ADHD impaired his communication with HPD staff."  Weaving Decl., Ex. 14, pp. 7-8 (doc. #31).  Dr. Monkarsh further concluded:

> [Plaintiff] has suffered from [ADHD] . . . since age six, and continues to suffer from this condition to this day. . . . Just as [Plaintiff] struggled with taking out his frustrations with children and teachers in the 1st and 2nd grades, so too was he accused of blurting out comments to HPD staff when frustrated.  This long-standing pattern of speaking first, and

17 - OPINION AND ORDER

dealing with the consequences of his actions later culminated in [Plaintiff] being placed on administrative leave, and later being terminated from his job with the HPD.

Id., pp. 7-8 (doc. #31).

Viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether Plaintiff's ADHD substantially limits him in the major life activities of communicating with others and interacting with others.

### 2. Substantially Limited in Working

Defendant argues Plaintiff presents no evidence showing he is substantially limited in the major life activity of working. Having already concluded Plaintiff raises a genuine issue of material fact as to whether he is substantially limited in the major life activities of communicating and interacting with others, I need not address this issue. See EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities ("EEOC Enforcement Guidance"), 1997 WL 34622315, at *3 (March 25, 1997) ("[T]he first question is whether an individual is substantially limited in a major life activity other than working (e.g., sleeping, concentrating, caring for oneself)."); McAlindin, 192 F.3d at 1233 (concluding that because "the other activities–specifically sleeping, engaging in sexual relations, and interacting with others . . . are 'major life activities' within the meaning of the ADA," it "need not address the district court's conclusion that [plaintiff] was not substantially limited in his ability to work"); Waters v. Fred Meyer Stores, Inc., No. CV 08-322-HU, 2009 WL 1874271, at *5 (D. Or. 2009) ("[T]he first question is whether the plaintiff is substantially limited in a major life activity other than working. Only if there are no such limitations does the inquiry shift to

whether there is a substantial limitation on the plaintiff's ability to work.") (Internal citation and emphasis omitted).

### B. "Regarded As" Disabled

Plaintiff contends the statements made and measures taken by Defendant create a genuine issue of material fact as to whether Defendant perceived him as having a disability. "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(A). Under the regarded as prong of the ADA, a covered entity must "entertain misperceptions about the individual–it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999); Busiere v. Providence Health Sys.-Or., Civil No. 05-630-PK, 2006 WL 3827460, at *10 (D. Or. 2006) (Defendant "must have believed that [plaintiff] either had a substantially limiting impairment that she did not have, or that she had a substantially limiting impairment which, in fact, was not so limiting.") (Citation omitted). "[T]he purpose of the regarded as prong is to cover individuals rejected from a job because of the myths, fears and stereotypes associated with disabilities." Johnson v. Paradise Valley Unified School Dist., 251 F.3d 1222, 1229 (9th Cir. 2001); Busiere, Civil No. 05-630-PK, 2006 WL 3827460, at *10 ("Congress intended to protect people from a range of discriminatory actions that are based on myths, fears and stereotypes about disability, which occur regardless of whether the individual has a substantially limiting impairment."). The employer "must 'regard[ ]

19 - OPINION AND ORDER

the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled.'" Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3rd Cir. 2002).

I conclude the statements made by Defendant create a triable issue of fact as to whether Defendant regarded Plaintiff as disabled. Lieutenant Goerling stated that Plaintiff "demonstrates a disturbing lack of interpersonal skills that . . . suggests the need for further investigation by a qualified medical professional" and that Plaintiff's behavior "demonstrate[d] complete failure of basic interpersonal relationship skills . . . embodied . . . generally in society." Goldberg Decl., Ex. 15, pp. 1, 3, 13 (doc. #32). Similarly, Deputy Chief Skinner testified he had been aware of "flaws" in Plaintiff's "communication style and relationships" before the City had even hired Plaintiff and expressly testified that Plaintiff had issues concerning his "communication styles and/or lack of being able to connect/foster relationships with people or be relational in the way he communicated with people." Goldberg Decl., Ex. 1, pp. 2-3 (doc. #32); Id., Ex. 3, pp. 1-2, 10-11 (doc. #32); Goldberg Decl. Ex. 1, p. 4 (doc. #26); Weaving Decl., ¶ 10 (doc. #31). Based on these statements, a reasonable jury could find that the City regarded Plaintiff as disabled within the meaning of the ADA at the time the City had hired Plaintiff and held that same belief at the time it terminated him.

With respect to the measures taken by Defendant–including placing Plaintiff on administrative leave, requiring him to participate in fitness for duty examinations, requiring him to release his medical records to the City, requiring him to complete a forensic history questionnaire, and subjecting him to an extensive interview process–courts have previously indicated that such actions are generally insufficient to raise a genuine issue of material fact

showing defendant perceived plaintiff as having an impairment.  See Magdaleno v. Wash. Cnty.,
277 Fed. Appx. 679, 681 (9th Cir. 2008) ("That [defendant] was aware of [plaintiff's] PTSD
diagnosis, required him to submit to a psychological evaluation, and took steps to accommodate
his PTSD, [was] insufficient to create a triable issue of fact on the 'regarded as' prong.");
Lanman v. Johnson Cnty., Kan., 393 F.3d 1151, 1157 (10th Cir. 2004) (defendant's "order that
[plaintiff] take a fitness for duty exam" did not show plaintiff was "was perceived as mentally
impaired" where plaintiff "was a long-time employee with a good employment history who
suddenly became involved in several troubling incidents affecting co-workers"); Doe v. Bd. of
Educ., 63 Fed. Appx. 46, 49 (2d Cir. 2003) ("Employers need to be able to use reasonable means
to ascertain the cause of troubling behavior without exposing themselves to ADA claims.").
Coupled with the statements made by Deputy Chief Skinner and Lieutenant Goerling noted
above, however, a reasonable jury could conclude that the measures taken by Defendant in this
instance raise a triable issue of fact as to whether the City regarded Plaintiff as having a mental
impairment within the meaning of the ADA.

In sum, drawing all reasonable inferences and construing the evidence in the light most
favorable to Plaintiff, I conclude the statements made and measures taken by Defendant provide
sufficient evidence from which a reasonable jury could find that the City regarded Plaintiff as
being substantially limited in communicating and interacting with others.[3]  Anderson, 477 U.S at

---

[3] Defendant contends summary judgment should be granted in its favor because no one
from the City ever told Plaintiff he was perceived as being disabled.  O'Kasey Decl., Ex. 2, 66:3-
67:5,67:20-68:4,70:9-15,75:9-20 (doc. #23).  Even assuming this to be true does not necessarily
lead to the conclusion that Defendant did not regard Plaintiff as having a disability.

255.  Defendant's motion for summary judgment against Plaintiff's "regarded as" claims are

therefore denied.

### C. Failure To Engage in the Interactive Process

Defendant contends it did not violate the ADA by not engaging in the interactive process

with Plaintiff because Plaintiff's request for a reasonable accommodation came after he had

already been placed on administrative leave and after the commencement of an internal affairs

investigation.  Defendant's argument lacks merit.

Here, Plaintiff explicitly asked that "all reasonable accommodations be made by the City

of Hillsboro to accommodate [his] disorder," including that he be returned to active duty "as a

Patrol Sergeant . . . without any undue delay."  Weaving Decl., Ex. 4, p. 3 (doc. #31).  "[T]he

interactive process is a mandatory rather than a permissive obligation on the part of employers

under the ADA and . . . is triggered by an employee or an employee's representative giving notice

of the employee's disability and the desire for accommodation."  Barnett v. U.S. Air, Inc., 228

F.3d 1105, 1112 (9th Cir. 2000) (en banc) (internal quotation omitted), vacated on other grounds,

U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 122 (2002); Humphrey v. Mem'l Hosp. Ass'n, 239

F.3d 1128, 1137 (9th Cir. 2001) ("Once an employer becomes aware of the need for

accommodation, that employer has a mandatory obligation under the ADA to engage in an

interactive process with the employee to identify and implement appropriate reasonable

accommodations.") (Citing Barnett v. U.S. Air, Inc., 228 F.3d at 1114).

The Ninth Circuit has previously stated:

[T]he duty to accommodate "is a 'continuing' duty that is 'not exhausted by one
effort.'"  The EEOC Enforcement Guidance notes that "an employer must consider
each request for reasonable accommodation," and that "[i]f a reasonable

accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." Thus, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective.

Humphrey, 239 F.3d at 1138 (citations omitted).

"The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." Id. at 1137 (citations omitted). An employer violates the ADA by not making reasonable accommodation for a qualified employee with a disability "unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) (internal quotation marks and citation omitted); ORS 659A.112(2) (An employer violates the statute if the employer fails to "make reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability . . . ."). The "term 'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 1211(9)(B).

23 - OPINION AND ORDER

Defendant relies heavily on the EEOC Enforcement Guidance ("EEOC Guidance") in support of its position that it is entitled to summary judgment. A careful reading of the EEOC Guidance, however, supports Plaintiff's position, not Defendant's position. For example, the EEOC Guidance states that although "an employer is not required to excuse past misconduct," the employer must "make [a] reasonable accommodation to enable an otherwise qualified individual with a disability to meet such a conduct standard in the <u>future</u>, barring undue hardship." EEOC Guidance, 1997 WL 34622315, at *15 (emphasis added). The model examples in the EEOC Guidance also appear to support Plaintiff's position. In the first model example, the employee discloses her disability to her employer <u>after</u> she was suspended for violating a standard of conduct. Id. The EEOC Guidance advises that in such a case the employer is required to "grant [the employee's] request for a leave of absence as a reasonable accommodation . . . to enable her to meet [the] conduct standard in the <u>future</u>." Id. (emphasis added). In the second model example, the employee is disciplined for repeatedly being tardy to work, and <u>after</u> being disciplined explains that his tardiness is caused by his disability and requests that his shifts be scheduled later. Id. The EEOC Guidance explains that in such a case, the employer "may discipline" the employee for violating a conduct standard, but requires the employer to "consider reasonable accommodation, barring undue hardship, to enable [the employee] to meet th[e] standard in the <u>future</u>." Id. (emphasis added). The EEOC Guidance simply does not stand for the proposition that the City in this instance was not required to engage in the interactive process with Plaintiff.

Defendant cites <u>Brown v. Lucky Stores, Inc.</u>, 246 F.3d 1182, 1187-88 (9th Cir. 2001), <u>Hill v. Kansas City Area Transportation Authority</u>, 181 F.3d 891, 894 (8th Cir. 1999), and

24 - OPINION AND ORDER

Pernice v. City of Chicago, 237 F.3d 783, 785-86 (7th Cir. 2001) for the proposition that an employee must apprise his employer of his disability before the employer takes an adverse action against the employee.[4]  None of these cases, however, supports Defendant's position.

In Brown, 246 F.3d at 1187-88, the Ninth Circuit concluded plaintiff's employer, Lucky Stores, was "under no affirmative obligation to provide an accommodation for [plaintiff]" because she did not "ask[] for an accommodation" and "testified that she never believed she needed rehabilitation while working for Lucky Stores." Id. at 1188.  Unlike Brown, here Plaintiff expressly told Defendant he had ADHD and expressly requested an accommodation.

In Hill, 181 F.3d at 893, plaintiff was found sleeping on the job a second time and was threatened with termination.  Before being fired plaintiff "asked [her superiors] to send [her] and have [her] checked out to see what's going on . . . because it's something that's wrong." Id.  The Eighth Circuit concluded that rather than requesting a "disability accommodation," plaintiff merely "asked for a second chance to better control her treatable medical condition." Id. at 894. The Eighth Circuit stated plaintiff's accommodation request "was not within her employer's control" because the employer "controlled [plaintiff's] work conditions . . . [and] . . . was not her doctor or pharmacist." Id.  In contrast to Hill, here Plaintiff did not ask the City to have him "checked out," and his request was not one solely within the providence of his doctors. Hill is distinguishable on its facts.

I am also unpersuaded by the decision in Pernice, 237 F.3d at 785-86.  First, that case involved a motion to dismiss, not a motion for summary judgment, as is the case here.

_____

[4] Defendant also cites Davila v. Quest Corp., 114 F. Appx. 849 (10th Cir. 2004).  Def.'s Mem. In Supp. Of Mot. For Summ. J., p. 13.  I, however, am unable to find this case based on the citation provided by Defendant.

Defendant's reliance on <u>Pernice</u> overlooks the obvious and important differences between a

motion for summary judgment and a motion to dismiss, including the evidentiary burdens

imposed on the parties.  Second, the issue in <u>Pernice</u> was whether an employee's criminal

misconduct–possessing drugs–"necessarily implicate[d] the employee's alleged disability." <u>Id.</u> at

786.  It is axiomatic that the issue in <u>Pernice</u> is not presently before this court, and accordingly,

Defendant's reliance on <u>Pernice</u> is unavailing.

Defendant makes the additional argument that the ADA does not erect an impenetrable

barrier around a disabled employee preventing the employer from taking action against the

employee or requiring it to provide an employee with a fresh start or second chance, citing

<u>Siefken v. Village Of Arlington Heights</u>, 65 F.3d 664,666-67 (7th Cir. 1995), <u>Hill</u>, 181 F.3d at

894, <u>Burch v. Coca-Cola Co.</u>, 119 F.3d 305, 320 n.14 (5th Cir. 1997), and <u>Office of Senate

Sergeant at Arms v. Office of Senate Fair Emp't. Practices</u>, 95 F.3d 1102, 1107-08 (Fed. Cir.

1996).  A careful reading of those cases, however, does not support Defendant's arguments.

In <u>Siefken</u>, 65 F.3d at 666-67, plaintiff was a probationary police officer who was

terminated after experiencing a diabetic reaction which caused him to drive his squad car

erratically at excessive speeds.  <u>Id.</u> at 665-66.  The police officer in that case "did not ask for an

accommodation for his diabetes, before or after the incident," and at oral argument expressly

stated he simply wanted a "second chance." <u>Id.</u> at 667, 667 n.3.  Unlike the plaintiff in <u>Siefken</u>,

here Plaintiff did not simply ask for a "second chance."  Rather, he explicitly asked that "all

reasonable accommodations be made by the City of Hillsboro to accommodate [his] disorder,"

"including," but not limited to, being returned to active duty as a Police Sergeant.  Weaving

Decl., Ex. 4, p. 3 (doc. #31).

26 - OPINION AND ORDER

In <u>Burch</u>, 119 F.3d at 313, the underlying case had gone to trial and "[b]oth parties appeal[ed] from the magistrate judge's rulings on [defendant's] Rule 50 motions for judgment as a matter of law."  On appeal, the Fifth Circuit stated that "an employee who requests only the opportunity to return to an unmodified, previously-held  position fails to state a cognizable claim under 42 U.S.C. § 12112(b)(5)." <u>Id.</u> at 314.  The Fifth Circuit's decision, however, also turned on the fact that the plaintiff there failed to establish a prima facie case of disability discrimination, namely Plaintiff failed to establish that his "alcoholism . . . substantially impaired <u>any</u> major life activity" and failed to "establish that he was a qualified individual" within the meaning of the ADA. <u>Id.</u> at 314, 318  (emphasis in original).  Suffice it to say, a plaintiff is not entitled to a reasonable accommodation if he is not substantially impaired in any major life activity or is not a "qualified individual" as defined under the ADA. <u>E.g.</u>, <u>Nunes</u>, 164 F.3d at 1246.  As discussed above, Plaintiff proffers sufficient evidence creating a genuine issue of material fact that he is substantially limited in major life activities, and Defendant does not argue whether Plaintiff is or is not a "qualified individual." <u>Burch</u> is simply not binding here.

In <u>Office of Senate Sergeant at Arms</u>, 95 F.3d at 1109, the Federal Circuit concluded the decision by the Independent Hearing Board (the "Board") was erroneous.  In that case, the Federal Circuit held the Board's decision mandating that all prior discipline imposed on plaintiff be rescinded, that plaintiff be made "whole for all wages and benefits lost as a result of the discipline imposed," and that "all documentation concerning" plaintiff's discipline be purged from his records amounted to a "retroactive accommodation" and "fresh start" not contemplated under the ADA.  <u>Id.</u> at 1105, 1107.  Here, Plaintiff does not seek the type of accommodation

sought by the plaintiff in <u>Office of Senate Sergeant at Arms</u>.  Defendant's reliance on <u>Office of Senate Sergeant at Arms</u> is clearly misplaced.

Finally, Defendant contends Plaintiff's request for an accommodation was "amorphous." As noted above, Plaintiff explicitly asked that "all reasonable accommodations be made by the City of Hillsboro to accommodate [his] disorder."  Weaving Decl., Ex. 4, p. 3 (doc. #31). Plaintiff's request for a reasonable accommodation is not "amorphous."  <u>See</u> <u>Barnett v. U.S. Air, Inc.</u>, 228 F.3d at 1112 ("An employee requesting a reasonable accommodation should inform the employer of the need for an adjustment due to a medical condition using 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'") (Citation omitted).

In sum, I am not persuaded by Defendant's arguments.  Based on the record before me, Plaintiff raises sufficient evidence creating a genuine issue of material fact as to whether Defendant failed to engage in the interactive process with him.  <u>See</u> <u>Shepard v. City of Portland</u>, Civil No. 09–0021–AA, 2011 WL 5282607, at *18 (D. Or. 2011)  ("Once an employee requests an accommodation . . . the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation.") (Citation omitted); <u>Humphrey</u>, 239 F.3d at 1137 ("Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations.").[5]

---

[5] Defendant raises new arguments in its reply, arguing that under Barnett v. U.S. Air, Inc., 228 F.3d at 1116, employers who fail to engage in the interactive process face liability only if a reasonable accommodation would have been possible.  Defendant also contends for the first time in its reply that reinstating Plaintiff would have resulted in undue hardship.  Def.'s Reply in Supp. of Mot. for Summ. J., pp. 13-17.  Arguments raised for the first time in a reply are improper, and accordingly, I will not address the new arguments raised in Defendant's reply.  E.g., Adriana Int'l

(continued...)

**D. Legitimate Non-Discriminatory Reasons for Plaintiff's Discharge**

I turn next to whether Defendant offers a legitimate non-discriminatory reason for its adverse employment action against Plaintiff.  E.g., Diaz, 521 F.3d at 1207 (once plaintiff establishes a prima facie case for discrimination, the burden shifts to defendant to offer a legitimate non-discriminatory reason for the adverse action).  Defendant argues, and I agree, that Deputy Chief Skinner's November 24, 2009, termination letter to Plaintiff provides legitimate non-discriminatory reasons for terminating Plaintiff.  O'Kasey Decl., Ex. 7, pp. 11-12 (doc. #23).  Accordingly, the burden shifts back to Plaintiff to show that Defendant's reasons were actually pretexts for discrimination.  Lucero v. Hart, 915 F.2d 1367, 1371 (9th Cir. 1990) (if defendant proffers a legitimate non-discriminatory reason for its adverse action, the burden shifts back to plaintiff to show that defendant's reason is actually a pretext for discrimination).

Plaintiff may meet his burden "in two ways, either [1] directly by persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence."  Merrick v. Farmers Ins. Grp., 892 F.2d 1434, 1437 (9th Cir. 1990) (internal cites and quotations omitted).  "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present 'specific' and 'substantial' facts showing that there is a genuine issue for trial."  Noyes v. Kelly Serv., 488 F.3d 1163, 1170 (9th Cir. 2007) (citation omitted).

---

[5](...continued)
Corp. v. Thoeren, 913 F.2d 1406, 1417 n.12 (9th Cir. 1990) (declining to address an argument raised for the first time in the reply brief); Mitchell v. Tri-Cnty. Metro. Transp. Dist., No. 04-CV-1359-BR, 2005 WL 3447941, at *9 (D. Or. 2005) ("The [c]ourt . . . need not consider arguments made for the first time in a [motion for summary judgment] reply brief") (citation omitted).

As a basis for terminating Plaintiff, Deputy Chief Skinner stated in Plaintiff's November 24, 2009, termination letter that Plaintiff was "boastful at the expense of others."  O'Kasey Decl., Ex. 7, pp. 11-12 (doc. #23).  Deputy Chief Skinner also stated in the same letter that Plaintiff was "exploitive of others."  Id. at 12 (doc. #23).  When questioned about his reasons for terminating Plaintiff, however, Deputy Chief Skinner testified that he could not specifically remember what had led him to conclude that Plaintiff was "boastful."  Goldberg Decl., Ex. 3, p. 3 (doc. #32).  In addition, although Deputy Chief Skinner testified that Plaintiff was "exploitive" because he "divide[d] the team . . . [between] meat eaters [and] salad eaters . . . and then connect[ed] with only those who advance[d] [Plaintiff's] cause," Deputy Chief Skinner could only recollect Plaintiff was a "part of the conversation . . . delineat[ing] meat eaters and salad eaters."  Id., pp. 6-7 (doc. #32).

Viewing the totality of the evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in Plaintiff's favor, Anderson, 477 U.S. at 255, I conclude there is sufficient evidence to create a genuine issue of disputed material fact as to whether Defendant's reasons for terminating Plaintiff were pretexts for discrimination.[6]

## IV. Plaintiff's Motion for Partial Summary Judgment

Lastly, I turn to Plaintiff's motion for partial summary judgment.  Plaintiff moves for partial summary judgment on Defendant's Fifth and Sixth Defenses.[7]  Defendant's Fifth Defense

---

[6] Plaintiff makes other arguments regarding pretext.  However, as discussed above, Plaintiff presents sufficient evidence creating a triable issue of material fact regarding pretext and accordingly, it is unnecessary to address Plaintiff's additional arguments.

[7] The parties essentially make the same arguments posited in Defendant's motion for summary judgment.  For the sake of brevity, I do not re-address the same arguments presented in

(continued...)

alleges "Plaintiff fails to state a claim for failure to reasonably accommodate" on the basis that

"any potential accommodation would not be reasonable."  Answer, ¶ 8.  Defendant's Sixth

Defense alleges the accommodations requested by Plaintiff would create an undue hardship on

Defendant.  Id.

### A. Defendant's Fifth Defense

The main thrust of Plaintiff's arguments is that he is entitled to summary judgment on the

City's Fifth Defense because Defendant failed to engage in any interactive process with Plaintiff.

Although it would appear at a passing glance that Plaintiff's assertion has merit, the Ninth Circuit

"makes clear . . . that employers who fail to engage in the interactive process face liability only 'if

a reasonable accommodation would have been possible.'"  Davis v. Wal-Mart Stores, Inc., No.

CV–09–1488–HU, 2011 WL 2729238, at *18 (D. Or. 2011) (citing Barnett v. U.S. Air, Inc., 228

F.3d at 1116); see also Collins v. Wal-Mart Stores, Inc., No. CV 07-1780-ST, 2009 WL

1286379, at *14 (D. Or. 2009) (defendant's "failure to engage in the interactive process does not

automatically subject it to liability under the ADA.  Instead, [defendant] is liable only if a

reasonable accommodation otherwise would have been possible without undue hardship.").

Plaintiff "has the burden of showing the existence of a reasonable accommodation that would

have enabled him to perform the essential functions of an available job."  Dark v. Curry Cnty.,

451 F.3d 1078, 1088 (9th Cir. 2006)

Here, Defendant proffers sufficient evidence indicating Plaintiff's request that he be

returned to active duty as a Patrol Sergeant was not reasonable.  In a letter dated December 9,

---

[7](...continued)
Defendant's motion for summary judgment.

2009, Deputy Chief Skinner expressly stated that Plaintiff's requested accommodation that he be "returned to duty as a sergeant" was "unreasonable and/or would result in an undue hardship" on the City. O'Kasey Decl., Ex. 8, p. 1 (doc. #23). Deputy Chief Skinner explicitly reasoned that the "safety of [Plaintiff's] fellow officers . . . and members of the public" depended on "an established bond of respect, loyalty, trust, and a demonstrated ability to interact and respond immediately and appropriately in any emergency" and that Plaintiff's "past interactions with [his] subordinates, supervisors and peers demonstrate[d] . . . that the bond [had been] irrevocably broken." Id. The evidence proffered by Defendant is sufficient to create an issue of material fact as to whether the accommodation requested by Plaintiff, namely that he immediately be brought back to work as Police Sergeant, was reasonable. Plaintiff's motion for partial summary judgment with respect to Defendant's Fifth Defense is therefore denied.

**B. Defendant's Sixth Defense**

Plaintiff asserts the City's Sixth Defense does not survive summary judgment because there was no undue hardship in bringing him back to work. I disagree.

"The term 'undue hardship' means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." 42 U.S.C. §12111(10)(A). Subparagraph (B) provides that "[i]n determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include . . . the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity." 42 U.S.C. §12111(10)(B)(iv); 29 C.F.R. § 1630.2(p)(2)(iv) (same). "Undue hardship refers not only to financial difficulty, but to

reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business.  An employer must assess on a case-by-case basis whether a particular reasonable accommodation would cause undue hardship." EEOC Enforcement Guidance: Reasonable Accommodation & Undue Hardship Under the Americans with Disabilities Act No. 915.002, 2002 WL 31994335, at *4 (Oct. 17, 2002).

Defendant proffers evidence showing Plaintiff's accommodation request would have imposed an undue hardship on Defendant.  As noted above, Plaintiff offers evidence demonstrating that Plaintiff's past interactions with his subordinates, supervisors and peers demonstrated that the "bond" of respect, loyalty, trust, and ability to interact and respond appropriately in emergency situations had been "irrevocably broken."  O'Kasey Decl., Ex. 8, p. 1 (doc. #23).  The evidence proffered by Defendant is sufficient to create an issue of material fact as to whether the accommodation requested by Plaintiff–that he immediately be brought back to work as Police Sergeant–would have created an undue hardship on Defendant.  Accordingly, Plaintiff's motion for partial summary judgment regarding Defendant's Sixth Defense is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED, and Plaintiff's motion for partial summary judgment is DENIED.

IT IS SO ORDERED.

Dated this 16th day of February, 2012.

 /s/ Marco A. Hernandez
MARCO A. HERNANDEZ
United States District Judge

33 - OPINION AND ORDER